*1183 DYK, Circuit Judge.
Ferring B.V. (“Ferring”) and Aventis Pharmaceuticals, Inc. (“Aventis”) brought suit against Barr Laboratories, Inc. (“Barr”) for infringement of Ferring’s patent, U.S. Patent No. 5,407,398 (filed Dec. 17, 1985) (“ ’398 patent”). Barr moved for summary judgment, arguing that the ’398 patent was unenforceable due to inequitable conduct and, alternatively, that Barr did not infringe the’398 patent. The district court granted summary judgment on both grounds. We affirm the district court’s grant of summary judgment on the ground that the patent is unenforceable due to inequitable conduct, and we do not reach the issue of infringement.
BACKGROUND
Ferring patented a medicinal compound and a method of administering said compound. Specifically, claim one of Fer-ring’s ’398 patent (the independent composition claim) claimed an “antidiuretic composition for humans comprising a gas-trointestinally absorbable, antidiuretically effective, amount of [the peptide] 1-deam-ino-8-D-arginine vasopressin and a phar-maceutically acceptable carrier in solid oral dosage form for absorption in the gastrointestinal tract of said humans.” ’398 patent at col.4 1.23-29. 1-deamino-8-D-argiriine vasopressin and other compounds were known in the art to prevent the diuretic symptoms associated with diabetes when they were absorbed through the walls of the patient’s mouth via a dissolving tablet, or through the patient’s nasal passage via a liquid spray or plastic tube. However, such modes of administering the medicine proved cumbersome and time-consuming. Therefore; the claimed solid oral dosage form of the compound and method of administering it were thought to be an improvement over thé prior art, because the medicine was designed to be simply swallowed and absorbed through the gastrointestinal tract. As the inequitable conduct claim arises from the prosecution history of the ’398 patent, we will begin there.
I
On December 17, 1985, Hans Vilhardt and Helmer Hagstam filed an application for the ’398 patent.[1] On May 28, 1986, Vilhardt and his counsel appeared at a preliminary interview conducted by Examiners Moyer and Stone at the Patent and Trademark Office (“PTO”). At the interview, the examiners discussed certain pri- or art references, including U.S. Patent No. 3,497,491 (filed Sept. 14, 1967) (“ ’491 patent” or “Zaoral patent”). Ferring was the exclusive licensee of the ’491 patent until its expiration in 1987. The ’491 patent taught, for antidiuretic purposes, that “l-deamino-8-D-arginine vasopressin” “may be used ... for the parenteral, pero-ral, intranasal, subcutaneous, intramuscular, or intravenous application.” ’491 patent at col.3 1.15-23, col.5 1.15-20 (emphasis added). The examiners were concerned that the ’491 patent’s disclosure of the “peroral” application of the peptide may have suggested the oral administration of the peptide for gastrointestinal absorption. Vilhardt argued that the term “peroral” as used in the ’491 patent did not teach the oral administration of the peptide for gastrointestinal absorption, but rather for absorption through the walls of the mouth. *1184 As the examiners were not entirely convinced, they “suggested that applicants obtain evidence from a non-inventor ” to support their interpretation of the term “peroral.” J.A. at 3460 (emphasis added).
In response, on June 12, 1986, Vilhardt, through his counsel, submitted four declarations including two from Vilhardt himself, one from a Dr. Myron Miller, and one from a Dr. Paul Czernichow. These declarations each relayed the writer’s scientific belief that the term “peroral” in the ’491 patent meant that the compound could be administered “through the mouth,” but only for absorption through the cheek of the mouth or under the tongue. However, the declarations failed to disclose that Czernichow had been receiving research funding from Ferring from 1985-86.[2] Specifically, Czernichow received research funding to conduct a clinical investigation relating to a particular drug (DDAVP) preparation.
Despite the declarations, on November 13, 1986, the examiners rejected certain claims of the ’398 patent as anticipated or obvious over the ’491 patent: The rejection stated: “As Applicants are the exclusive licensee of the Zaoral [’491] patent, it is obviously expeditious for Applicants to argue that ‘peroral’ referred to in the [’491] patent referred only to sublingual or buccal routes, whereas the instant mode of administration excludes such routes as it involves absorption by the gastrointestinal tract.” J.A. at 4390.
The inventors requested reconsideration after which a new examiner, Examiner Siegel, reaffirmed the rejections. Examiner Siegel stated that the ’491 patent “clearly teaches orally administering said vaso-pressin,” and that “oral administering of a drug ... unambiguously means gastrointestinal absor[p]tion.” J.A. at 3067.
On November 13, 1987, the inventors appealed this rejection to the Board of Patent Appeals and Interferences (“Board”). On September 21, 1990, the Board accepted the declarants’ view that, as a general rule, the “peroral” administration of a peptide would not be read in the art as suggesting the administration for gastrointestinal absorption. This is because peptides are normally “hydrolyzed in the stomach and it would be expected that their biological activities would be lost” prior.to gastrointestinal absorption. J.A. at 3688. Thus, the ’491 reference standing alone would not anticipate the applicant’s claims regarding the peroral administration of the peptide. However, the Board determined that the applicants’ claims were obvious over the ’491 patent in light of an article written by Ivan Vavra in 1973. Vavra disclosed that l-deamino-8-D-argi-nine vasopressin is structurally unique among peptides in that it does not degrade quickly. The Board found that although the term “peroral” may not usually suggest the gastrointestinal absorption of a peptide, the ’491 patent’s disclosure of the “peroral” administration of l-deamino-8-D-arginine vasopressin, when combined with Vavra’s disclosure that this peptide is slow to degrade, would render the applicant’s claims obvious. The Board thus affirmed the examiners’ obviousness rejection. However, because the examiners had not relied on the Vavra reference, the Board designated its decision as “a new rejection under the provisions of 37 C.F.R. [§ ] 1.196(b),” and explained that the applicant could “elect to have further prosecution before the examiner in response to the new rejection ....” J.A. at 3690.
*1185 The inventors opted to go back to the examiners. On November 21, 1990, the inventors submitted five more declarations to persuade the examiners that the Yavra reference would not, when read with the ’491 patent, suggest the gastrointestinal absorption of the peptide. As before, the inventors submitted declarations from Vilhardt, Miller, and Czernichow. They also submitted declarations from a Dr. lain Robinson and a Dr. Tomislav Barth. Each of these declarations explained why, in the declarant’s own professional judgment, the Vavra reference did not suggest that the peptide could be absorbed gastrointestinally. Just as before, the inventors did not inform the examiners that Czernichow had been receiving funds from Ferring.[3] This time, however, they also failed to inform the examiners that Robinson (one of the new declarants) had been Ferring’s preclinical research director from 1985-1986 and a paid consultant for Ferring from 1986-1989. While Robinson was the research director at Ferring, Ferring was funding Vilhardt’s research involving the peptide at issue. The inventors also did not disclose that Barth (another new de-clarant) worked on several projects funded by Ferring between 1984 and 1987. Barth also worked intermittently with Vilhardt on some small projects between 1988 and 2000, although it is unclear from Barth’s testimony whether this research was funded by Ferring. Neither Robinson’s nor Barth’s declarations was accompanied with a Curriculum Vitae (“CV”). Czernichow’s declaration did include an extensive CV. However, it did not mention his research with Ferring.
Vilhardt communicated with each of these declarants before their declarations were submitted to the PTO. Vilhardt also sent Barth a “draft declaration.” While it is unclear exactly what was contained in the draft declaration, Vilhardt admitted that he gave Barth “some lines,” telling him “what he should describe in the affidavit.” J.A. at 5544. Vilhardt also sent Robinson a “draft declaration.”
In sum, four of the five declarations submitted to the PTO in 1990 were written by scientists who had been employed or had received research funds from Ferring, and Vilhardt participated in the drafting of two of the four declarations submitted by non-inventors. The examiners were not otherwise made aware of the Ferring connections. After these declarations were submitted, the examiners allowed the previously rejected claims, and the ’398 patent issued on September 10, 1991. The PTO did not provide any explanation for its allowance.
II
Ferring exclusively licensed the right to market and sell its patented antidiuretic compound to Aventis.[4] In July 2002, Barr' filed an Abbreviated New Drug Application (“ANDA”) with the Food and Drug Administration, seeking approval to market a generic version of the compound at issue. In connection with its ANDA, Barr filed a so-called “paragraph IV certification,” which is a statement that any relevant patents to the generic compound are either invalid or will not be infringed. 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (2000). *1186 Barr’s paragraph IV certification claimed that the ’398 patent was invalid. In response, Ferring filed an infringement action against Barr pursuant to 35 U.S.C. § 271(e)(2). Barr moved for summary judgment based on inequitable conduct and non-infringement. The district court granted summary judgment to Barr on both grounds. On the issue of inequitable conduct, the district court found:
The undisputed evidence in this case supports the finding of inequitable conduct by the patentee and its agents and the grant of summary judgment. The reluctance of the PTO to issue the ’398 patent was evident. Each affidavit submitted in support of its issuance was thus highly material to the prosecution history. That three of the challenged declarations were submitted after several iterations of rejected attempts to obtain the patent’s issuance speaks loudly as to motive and intent. While credibility determinations from a courtroom observation may at times be necessary on the issue of intent, here, the entire record presents clear and convincing evidence of an intent to mislead the examiners, even viewing the evidence, as it must be viewed, in the light most favorable to Plaintiff. The submission of the Czernichow and Robinson declarations, and to a lesser extent that of Barth, support a finding of intent to mislead the PTO.
J.A. at 18. The court specifically found that “it must have been clear to Dr. Vil-hardt at the preliminary meeting with the examiner that a non-inventor affidavit was sought for purposes of obtaining objective evidence that the invention was not anticipated by the prior art or obvious.” J.A. 16 (emphasis added). Ferring and Aventis timely appealed.
DISCUSSION
Appellants argue that the district court erred in granting summary -judgment to Barr on both the issues of inequitable conduct and infringement. Because we find that the district court properly granted summary judgment to Barr on the inequitable conduct ground, we do not reach the infringement issue.[5].
“Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of ‘candor, good faith, and honesty.’ ” Warner-Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1342 (Fed.Cir.2005) (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995)). While inequitable conduct includes affirmative misrepresentations of material facts, it also arises when the patentee fails to disclose material information to the PTO. Id.; Pharmacia Corp. v. Par Pharm., Inc., 417 F.3d 1369, 1373 (Fed.Cir.2005). “The inequitable conduct analysis is performed in two steps comprising ‘first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant’s conduct is so culpable that the patent should be held unenforceable.’ ” Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1362-63 (Fed.Cir.2003) (quoting Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1366 (Fed.Cir.2001)). The predicate facts must be proven by clear and convincing evidence. Id. at 1362. “While our precedent urges caution in the grant of summary judgment *1187 respecting a defense of inequitable conduct, summary judgment is not foreclosed.” Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed.Cir.1993); see also Digital Control Inc. v. The Charles Machine Works, 437 F.3d 1309, 1313, 2006 WL 288075 (Fed.Cir.2006) (“Determining at summary judgment that a patent is unenforceable for inequitable conduct is permissible, but uncommon.”).
I
We first consider the district court’s determination that there were no genuine issues of material fact with respect to materiality and intent. Our review.in this respect is without deference. Dayco Prods., 329 F.3d at 1362-63.
A. Materiality
For patent applications that have been prosecuted prior to 1992, we have held that “[ijnformation is deemed material if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent.” Li Second Family L.P. v. Toshiba Corp., 231 F.3d 1373, 1379 (Fed.Cir.2000) (quoting 37 C.F.R. § 1.56 (1989)); Syntex (U.S.A.) LLC v. Apotex, Inc., 407 F.3d 1371, 1384 (Fed.Cir.2005).[6] We have made clear that examiners have broad authority to request information that they deem relevant to the issue of patentability. Star Fruits S.N.C. v. United States, 393 F.3d 1277, 1283 (Fed.Cir.2005). In response to requests from examiners, applicants frequently submit supporting declarations. Given the ex parte nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant.
The general law of evidence has long recognized that the testimony of any witness may be rendered suspect by a past relationship with a party.[7] The pertinent rules for PTO examiners have specifically recognized this evidentiary principle, explaining: “Affidavits or declarations should be scrutinized closely and the facts presented weighed with care. The affiant’s or declarant’s interest is a factor which may be considered, but the affidavit or declaration cannot be disregarded solely for that reason.” J.A. at 5415 (The Manual of Patent Examining Procedure). As appellants concede, we have previously held that a declarant’s prior relationships with the patent applicant may be material, and that failure to disclose such relationships to the examiner may constitute inequitable con *1188 duct. Refac Int’l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1581-82 (Fed.Cir.1996); Paragon, 984 F.2d at 1191-92.
In Refac, the PTO examiner rejected an application because it did not sufficiently enable one skilled in the art to make the invention. 81 F.3d at 1578. The examiner stated that a supporting affidavit by the co-inventor had very little probative value and was “self serving.” Id. In response, the inventors suggested that they submit affidavits from people “other- than the inventors” to support the sufficiency of the disclosure. Id. They then submitted affidavits from three individuals but failed to disclose that at least one of the individuals had worked for the inventors’ company for a short eight-week period and was already familiar with the invention. Id. at 1580-81. We affirmed the district court’s finding that this omission was material and supported a finding of inequitable conduct. Id. at 1581-82. In so doing, we found it particularly important that “[a]n examiner must be able to evaluate information in an affidavit in context, giving it the proper weight ....” Id. at 1583.
In Paragon, the examiner requested “disinterested third party” declarations and when the inventors submitted the declarations, they failed to disclose that one of the declarants owned stock in the assign-ee’s company at the time of his declaration and had previously been a consultant for the company. 984 F.2d at 1191. The declarant also averred in his declaration that he had not been “employed” by the assignee’s company. Id. We decided not to “quibble about whether a ‘consultant’ is or is not ‘employed’ by a company,” finding instead that the declarant was not “a ‘disinterested’ party in any recognized sense of the word.” Id. at 1192. We then affirmed a finding of inequitable conduct based on omissions regarding the declar-ant’s affiliations. Id.
Here, appellants argue that the Ferring affiliations of declarants Czernichow, Robinson, and Barth, were immaterial as a matter of law because (1) those affiliations supposedly did not bear directly on the critical assertion that each made in his declaration, meaning that the relationships were not the source of the information in the declarations, and (2) the declarants did not have a direct financial stake in the success of the patent.
Our jurisprudence does not suggest such a narrow view of materiality.[8] A witness’s interest is always pertinent to his credibility and to the weight to be given to his testimony, and relevant interests are not limited to direct financial interests. Under Refac and Paragon, a declarant’s past relationships with the[1] applicant are material if (1) the declarant’s views on the underlying issue are material and (2) the past relationship to the applicant was a significant one. Here we think that each of these requirements was satisfied on the summary judgment record.
First, we agree with the district court that the declarations themselves were “highly material.”[9] The Board itself *1189 relied on Czernichow’s first declaration for the “general rule” that “peroral” would not be read by those in the art to suggest the gastrointestinal absorption of peptides. While the Board went on to reject the claims in light of the Vavra reference, Czernichow’s declaration certainly advanced the applicants’ argument. Moreover, the second set of declarations, which was plagued with even more undisclosed affiliations than the first set, was absolutely critical in overcoming the Board’s obviousness rejection. The Board had found that the oral administration of 1-deamino-8-D-arginine vasopressin for gastrointestinal absorption was obvious in light of Vav-ra and the ’491 patent. The sole purpose of the second set of declarations, therefore, was to show that the Vavra reference did not suggest that the peptide could be gas-trointestinally absorbed. Towards this end, the declarations challenged the veracity of the Vavra reference and claimed that the reference was inapplicable to human gastrointestinal absorption. Not only were these declarations pivotal, they were essentially opinions that were supported largely by the declarants’ own scientific expertise and little else.
Second, we think it is equally clear that the summary judgment record shows that the past relationships were significant. Most significantly, one of the declarants, Robinson, was the research director at Ferring at the same time that Vilhardt was serving as a consultant to Ferring and was conducting his research on the very peptide at issue. Robinson was also a paid consultant for Ferring in the year immediately prior to his declaration. Czernichow was receiving research funding from Fer-ring at various points throughout the prosecution of the' ’398 patent and directly received funding before and after his 1986 declaration and continuing at least to the period immediately before his 1990 declaration. Finally, while Ferring may not have made payments to Barth personally, Ferring did fund Barth’s research projects through Barth’s employer. The privilege logs submitted by Ferring refer to all three of the declarants as “Ferring Consultants.” [10]
These relationships were not isolated, nor were they confined to the distant past. The declarants clearly had ongoing and mutually beneficial relationships with Fer-ring during the prosecution of the ’398 patent. In particular, Robinson’s prior position as Ferring’s research director and his subsequent' consultant work for Fer-ring were extremely significant affiliations. The declarants were not disinterested. See Refac, 81 F.3d at 1581 (finding that “[i]t would surely have been important for the examiner, and any reasonable examiner, to know of Jones’s [ (the declarant) ] association with Lanpar [ (the inventor’s company) ]”).
*1190 Despite appellants’ assertions that the identity of the declarants was completely irrelevant to the examiners, the actual record made on summary judgment demonstrates otherwise. Indeed, it shows that the background, at least of the de-clarants Robinson and Czernichow, was not only material but was highly material. The examiners specifically requested “non-inventor” affidavits. Moreover, the examiners expressly stated that they were concerned about the objectivity of those trying to distinguish the ’491 patent from the ’398 patent. In their 1986 rejection, the examiners stated: “As Applicants are the exclusive licensee of the Zaoral [’491] patent, it is obviously expeditious for Applicants to argue that ‘peroral’ referred to in the patent referred only to sublingual or buccal routes, whereas the instant mode of administration [in their new patent] excludes such routes as it involves absorption by the gastrointestinal tract.” J.A. at 4390. The examiners were thus keenly aware of the fact that Ferring was the exclusive licensee of the ’491 patent, which was soon to expire, and had an interest in convincing the PTO that the application described an invention not disclosed in the ’491 patent. The examiners treated Ferring and the applicants as one and the same. Based on the examiners’ request for non-inventor affidavits and their subsequent comments, it is clear from the summary judgment record that the examiners were concerned about the objectivity of those providing declarations and their relationship to Ferring, and that they communicated this concern to the applicants.
Under such circumstances, the applicant is on notice as to the materiality of information regarding the declarants’ ties to Ferring. Of particular relevance here, we found in Refac that an examiner’s characterization of the inventor’s affidavit as “self-serving” put the inventors “on notice ... that affidavits from disinterested persons were needed in order to overcome the substantive ground of the rejection.” Id. at 1581-82 (emphasis added). Here, on summary judgment the district court was correct to conclude as a matter of law that the examiners’ request for non-inventor declarations was for declarations from individuals without intimate ties to the inventors or Ferring itself. The court could conclude from the record as a matter of law that this concern was pertinent to the further affidavits submitted following remand by the Board since the central concern was still the ’491 patent as prior art whether alone or in combination with the Vavra reference.
Finally, on the issue of materiality, appellants argue that they could have, at trial, presented evidence to raise a fact issue concerning either the significance of the experts’ views or the significance of the past relationships. But the appellants presented no such contrary evidence in response to the summary judgment motion. As we discuss below in connection with the issue of intent, the appellants cannot raise a genuine issue of material fact by speculating as to what evidence might have been introduced at trial.
Thus, the district court correctly determined that the undisputed facts established a threshold showing of materiality; indeed, the record established that the undisclosed information at least in the aggregate was highly material as a matter of law.
B. Intent
Even if an omission is found to be material, the omission must also be found to have been made with the intent to deceive. “Materiality does not presume intent, which is a separate ' and essential component of inequitable conduct.” GFI, *1191 Inc., 265 F.3d at 1274 (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 552 (Fed.Cir.1990)). However, “[ijntent need not, and rarely can, be proven by direct evidence.” Merck & Co., Inc. v. Danbury Pharmacol, Inc., 873 F.2d 1418, 1422 (Fed.Cir.1989). We recently held in Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348 (Fed.Cir.2005), that “in the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information.” Id. at 1354 (emphasis added) (finding that where the patentee “has not proffered a credible explanation for the nondisclosure ... an inference of deceptive intent may fairly be drawn in the absence of such an explanation”). Similarly, in Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253 (Fed.Cir.1997), we made it clear that “a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish ‘subjective good faith’ sufficient to prevent the drawing of an inference of intent to mislead.” Id. at 1257.[11] Contrary to Fer-ring’s argument, the question of intent is directed to the applicant’s intent, not to the intent of the declarants. Thus, that the declarants may have had no intent to deceive is entirely irrelevant. The question is whether the applicant (here Vil-hardt) had such an intent.
We need not in this case attempt to lay down a general rule as to when intent may be or must be inferred from the withholding of material information by an applicant. Suffice it to say that we have recognized, in cases such as Paragon, that summary judgment is appropriate on the issue of intent if there has been' a failure to supply highly material information and if the summary judgment record establishes that (1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding. See Bruno Indep. Living Aids, 394 F.3d at 1354; Critikon, Inc., 120 F.3d at 1257. Here, all three conditions are satisfied.
First, Barr established that Vilhardt knew of significant past relationships of at least two of the declarants. Vilhardt was aware that Robinson was Ferring’s preclinical; research director while Vilhardt was serving as a consultant to Ferring researching the very peptide at issue. Robinson served as Vilhardt’s contact at Ferring during this time. Vilhardt was also aware of Bath’s affiliation with Fer-ring. Although he testified that he did not believe that Barth was a Ferring “consultant,” he indicated that he was aware of a working arrangement between Ferring and Barth’s employer under which Ferring had funded support for Barth’s research. Additionally, as Ferring notes in its brief, “[bjetween 1988 and 2000, [Barth] worked a month most years in Dr. Vilhardt’s laboratory for which he was paid a maintenance stipend.” Ferring’s Br. at 28.[12]
As to the second question — Vilhardt’s knowledge of the materiality of the information — it is undisputed that the examin *1192 ers were concerned. about the identity of the affiants and that Vilhardt was aware of this concern since he was present at the interview with the examiners when the concern was expressed. A similar-factual scenario supported a finding of intent in Refac, 81 F.3d at 1580. There,- the examiner indicated that an affidavit by the co-inventor on a particular issue was “self-serving.” We concluded that “[g]iven what the examiner characterized as the self-serving nature of [the inventor’s] affidavit, [the applicants] were on notice from the PTO that affidavits from disinterested persons were needed in order to overcome the substantive ground of the rejection.” Id. at 1581-82 (emphasis added). We then upheld a finding of intent to mislead the PTO. Id. Similarly, the fact that the examiners here requested “non-inventor” affidavits and expressed concern about bias supports the district court’s conclusion that Vilhardt was on notice that disinterested affidavits were necessary, and knew or should have known that the Ferring affiliations were material.
Finally, the appellants urge that there is potentially a credible explanation here for the withholding. The crux of appellants’ argument is that there are possible benign explanations for the withholding and that evidence might have been developed at trial to support those theories. Thus, appellants assert that it was improper for the district court to grant summary judgment to Barr “without seeing or hearing from the accused Dr. Vilhardt,” Aventis’ Br. at 34, and complained that “Barr’s counsel did not ask Dr. Vilhardt or any other declarant a single question which would bear on the issue of intent.” Ferring’s Br. at 30. We find this argument to be quite remarkable. On summary judgment, in order to create a genuine issue, the appellants bore the burden of submitting an affidavit from Vilhardt to contradict the movant’s evidence of intent if they believed that testimony from Vilhardt would establish credible evidence for the withholding.[13] Appellants cannot create a genuine issue by suggesting that Vilhardt might have proffered favorable evidence at trial. As we said in Paragon, when the movant has “made a prima facie case of inequitable conduct by satisfying both elements thereof, the burden shift[s] to [the nonmovant] to come forward with evidence which would require reassessment of the validity of the defense.” 984 F.2d at 1191.
Appellants’ specific arguments fare no better. Appellants argue that Vilhardt, as a foreign scientist, was not familiar with patent prosecution, and therefore would not have known of “some obligation to disclose declarants’ associations with Fer-ring.” Aventis’ Br. at 28. There is no record evidence supporting Vilhardt’s lack of knowledge.[14] To the contrary, the summary judgment record compels the conclusion that Vilhardt was aware of his obligations. In executing his inventorship declaration, Vilhardt acknowledged his “duty to disclose information which is ma- *1193 ferial to the examination of this application.” J.A. 3455. Furthermore, Vilhardt was represented by counsel throughout the proceedings before the PTO.
Appellants also argue that “there was no reason for Dr. Vilhardt, a foreigner and non-lawyer, to have understood the examiner to be requesting declarations from persons with no relationship to Ferring.” Aventis’ Br. at 25. Here again, appellants offered nothing to support such an inference. As we have already discussed in Refac, once the examiner discounts an affidavit for bias, the applicant is deemed to be on notice that a disinterested affidavit is required. 81 F.3d at 1581-82. The evidence here indicates that the examiners previously discounted the opinions of those connected to Ferring because the examiners found Ferring to have a substantial interest in the patent. Given the examiners’ statements and the evidence that Vil-hardt understood their request and played more than a bystander’s role in obtaining the affidavits, one cannot reasonably infer that Vihardt was simply unaware of the examiners’ concerns or his duty to satisfy those concerns.
In short, appellants’ argument concerning credible explanations consists entirely of speculation. Conclusory allegations and attorney arguments are insufficient to overcome a motion for summary judgment. Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1353 (Fed.Cir.2001); Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc., 45 F.3d 1550, 1562 (Fed.Cir.1995) (“There must be sufficient substance, other than attorney argument, to show that the issue requires trial.”). As we said in Paragon, “insupportable, [or] specious ... explanations or excuses will not suffice to raise a genuine issue of fact.” 984 F.2d at 1190. In order to raise a genuine issue of fact, a party must submit conflicting evidence in the form of an affidavit or other admissible evidence.[15]
Far from there being a credible explanation for the withholding, there is evidence in the summary judgment record supporting a conclusion that the past relationships were deliberately concealed. Although Vilhardt (who was already known by the examiners to have an affiliation with Fer-ring) submitted a CV with his declaration which disclosed that he had previously been the Research Director at Ferring, Robinson’s declaration came with no CV and no indication that he was recently Ferring’s Research Director. Likewise, Barth’s declaration was submitted with no CV. Unlike the others, Czhernichow’s declaration was accompanied by an extensive CV. However, it failed to mention his research funding from Ferring. Under similar circumstances, we concluded that the omission of prior employment with the pat-entee supported a showing of intent. See Refac, 81 F.3d at 1581. So too Vilhardt initially stated that he had no contact with the declarants, but later admitted — when confronted with the privilege log referring *1194 to these individuals as Ferring consultants — that he had contacted each of the declarants and that he sent Barth and Robinson “draft declarations,”[16] thus suggesting a desire to conceal the extent of his involvement.
We conclude that the district court properly granted summary judgment on the issue of intent.
II
Having found that there were no genuine factual disputes with respect to the issues of materiality and intent, we turn to the question whether the court properly weighed materiality together with intent to determine that the conduct was “inequitable.” We review the district court’s ultimate finding of inequitable conduct for abuse of discretion. See Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed.Cir.1988); Paragon, 984 F.2d at 1191. The same standard applies to review of discretionary determinations where the district court rules on summary judgment. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142^3, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that the district court’s exclusion of expert testimony made in the context of a summary judgment motion was reviewed for abuse of discretion while the existence of separate issues of fact were reviewed de novo).[17]
In evaluating the conduct here, we note again that the omitted affiliation with respect to Robinson in particular was highly material since Robinson had actually been employed by Ferring. So too there was not simply a single omission. Rather, there were multiple omissions over a long period of time — a fact that heightens the seriousness of the conduct. See Refac, 81 F.3d at 1580, 1582 (finding that additional omissions, even if they do not themselves constitute inequitable conduct, can heighten the effect of the omission at issue). Here, by presenting five separate declarations to the examiners, the applicants appeared to have a broad consensus of scientific support to overcome the Vavra reference. In actuality, four of the five declarations were submitted by scientists with significant associations with the assignee itself. While we will never know how the examiners ■, may have weighed the declarations differently, it seems clear to us that this stellar showing of support would have, at the very least, been tarnished. In view of all the circumstances, we cannot find that the district court abused its discretion in finding inequitable, conduct.
In coming to this conclusion, we fully recognize that inventors often consult their colleagues or other persons skilled in the art whom they have met during the course of their professional life. Accordingly, when an inventor is asked to provide sup *1195 portive declarations to the PTO, it may be completely natural for the inventor to recommend, and even contact, his own colleagues or people who are, or who have been, affiliated with his employer and to submit declarations from such people. Nothing in this opinion should be read as discouraging such practice. Rather, at least where the objectivity of the declarant is an issue in the prosecution, the inventor must disclose the known relationships and affiliations of the declarants so that those interests can be considered in weighing the declarations. This is not an onerous burden to place on any applicant.
CONCLUSION
For the foregoing reasons, the decision below is affirmed.

AFFIRMED

COSTS
No costs.

. Inventors Vilhardt and Hagstam had been employed by Ferring and, in 1984, they assigned all of their prospective rights to the '398 patent to Ferring. Prior to the prosecution at issue, the inventors had twice filed applications for their invention, and both times their application was rejected as anticipated or obvious over U.S. Patent No. 3,497,-491.

. Czernichow testified that he was not receiving funding from Ferring in June 1986, when he submitted his first declaration.

. It is unclear from the record whether Czer-nichow was receiving research funding at the very time he drafted his second declaration.

. The salt form of l-deamino-8-D-arginine vasopressin, "DDAVP,” is the actual product at issue here. Ferring and Barr disagree as to whether DDAVP is covered by the ’398 patent. Because our opinion is confined to the inequitable conduct issue, we do not reach Barr's non-infringement claim, which would require us to resolve whether DDAVP is covered by the patent.

. See, e.g., GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1275 (Fed.Cir.2001) (finding infringement issues moot after patent was deemed unenforceable due to inequitable conduct).

. Although the PTO amended the language of 37 C.F.R. § 1.56 in 1992, we have continued to use the pre-1992 language regarding materiality for evaluating patents that were prosecuted before the amendment. See Dayco Prods., 329 F.3d at 1363-64. Prior to the amendment, the relevant portion of § 1.56 read: "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.” 37 C.F.R. § 1.56(a) (1991). See also Digital Control Inc, 437 F.3d at 1313-17, 2006 WL 288075 (finding that "the new Rule 56 was not intended to replace or supplant the ‘reasonable examiner' standard,” and recognizing that the case law supports several standards of materiality).

. See United States v. Robinson, 530 F.2d 1076, 1079-80 (D.C.Cir.1976) (finding a witness’s past business transactions with a party significant in assessing the witness's credibility); Aetna Ins. Co. v. Paddock, 301 F.2d 807, 812 (5th Cir.1962) (finding a witness’s past financial affiliation with a party significant in assessing his credibility); see also 3A Wig-more, Evidence § 949, at 786 (Chadbourn rev. 1983) ("The relation of employment, present or past, by one of the parties, is also usually relevant.”).

. Contrary to appellants' assertions, Juicy Whip v. Orange Bang, Inc., 292 F.3d 728 (Fed.Cir.2002) did not limit the relevance of particular affiliations to those where the affiliation gave the declarant specialized knowledge relating to his declarations. Juicy Whip simply held that the substance of an affidavit may be immaterial where the facts asserted therein were undisputed. See id. at 744. There is no concession in this case that the declarants’ views as to the meaning of the term “peroral” in light of the Vavra reference were undisputed during prosecution.

. "While it is not necessary to cite cumulative prior art because it adds nothing to what is already of record (although it may be prudent to do so), one cannot excuse the submission of a misleading affidavit on the ground that it *1189 was only cumulative. Affidavits are inherently material, even if only cumulative. The affirmative act of submitting an affidavit must be construed as being intended to be relied upon. It is not comparable to omitting an unnecessary act.” Refac, 81 F.3d at 1583 (emphasis added).

. Appellants argue that "Refac in fact held that, even after trial when credibility could be and was weighed, omitted disclosure of prior contacts that two PTO declarants [ (Bullen and Cikra) ] had had with the assignee of the patent in question did not suffice for materiality or intent, and did not constitute inequitable conduct.” Ferring’s Br. at 31. This is a misrepresentation of Refac 's holding. There was no issue on appeal in Refac as to whether the omitted disclosure of the prior contacts of these two declarants was inequitable conduct. Our opinion simply described the district ■court's opinion. 81 F.3d at 1579. Even the district court's holding regarding these two declarants is not pertinent here because these declarants had no employment or financial connection with the inventors. Id.

. See also Warner-Lambert Co., 418 F.3d at 1346; Pharmacia, 417 F.3d at 1373; Semiconductor Energy Lab. Co. v. Samsung Elec. Co., 204 F.3d 1368, 1375 (Fed.Cir.2000); cf. Dayco Prods., Inc., 329 F.3d at 1367 ("Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.'').

. The record is unclear as to whether Vil-hardt was aware of Czernichow’s longstanding relationship with Ferring.

. Appellants argue that the district court improperly made credibility findings concerning Vilhardt on summary judgment. TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1158 (Fed.Cir.2004) (holding that in some circumstances, summary judgment may be inappropriate when the credibility of an affiant is drawn into question). Here however, appellants' argument is misplaced because Vilhardt’s credibility was never in dispute. Credibility can only become an issue once a party offers a declarant’s testimony in support or in opposition to summary judgment.

. The situation here is quite different from that in In re Harita, 847 F.2d 801 (Fed.Cir.1988), where the charge of intent to mislead was refuted by detailed explanations of the failure to disclose prior art by a Japanese patent agent unfamiliar with United States patent requirements.

. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that once the movant properly supports its motion for summary judgment, the burden of production shifts to the non-movant and it "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial”) (internal quotation marks omitted); Biocorp, Inc., 249 F.3d at 1353 (“The party opposing the [summary judgment] motion must point to an evi-dentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusoiy statements are insufficient.”) (quoting Barmag Banner Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836 (Fed.Cir.1984)).

. Barr’s evidence that Vilhardt was involved in the drafting of the declarations consists of Vilhardt’s own deposition testimony that he sent “draft declarations” to both Barth and Robinson, as well as statements by Czerni-chow and Barth indicating that they did not write all parts of their declarations.

. See, e.g., Scholle Corp. v. Blackhawk Molding Co., Inc., 133 F.3d 1469, 1471 (Fed.Cir.1998) (reviewing a district court’s finding of equitable estoppel on summary judgment for abuse of discretion); Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 31 (1st Cir.2004) (reviewing a district court's finding of judicial estoppel on summary judgment for abuse of discretion); Nat’l Ass’n of Gov’t Employees v. City Pub. Serv. Bd., 40 F.3d 698, 707 (5th Cir.1994) (reviewing a district court's finding of laches on summary judgment for abuse of discretion); Booth v. Barber Transp. Co., 256 F.2d 927, 931 (8th Cir.1958) (reviewing a district court’s grant of specific performance on summary judgment for abuse of discretion).

. For example, an inventor is required to provide the Patent Office with all prior art references known to the inventor that are "material to patentability”; if the inventor provided selected references, he was accused of inequitable conduct in the selection; and if he provided an entire search report, he was accused of burying the significant references. The inventor was also required to provide a one-sentence statement about each reference that he listed; much was made of whatever was and was not in that sentence.