PROST, Circuit Judge,
dissenting.
I respectfully dissent because the majority, in my view, overlooks the compelling facts presented in this case and suggests *1366 legal standards contrary to our precedent. Although I am cognizant of this court’s rightful hesitance to allow a finding of inequitable conduct on summary judgment and agree with our precedent establishing that such a finding is reserved for a rare case, I firmly believe that this is that rare case. See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 439 F.3d 1335, 1339 (Fed.Cir.2006); Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313 (Fed.Cir.2006) (“Determining at summary judgment that a patent is unenforceable for inequitable conduct is permissible, but uncommon.”); Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed.Cir.1993) (“While our precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct, summary judgment is not foreclosed.”).
On the facts of this case, I would uphold the district court’s finding of inequitable conduct, including its finding of deceptive intent, based on the conduct of one of Levitón Manufacturing Company, Inc.’s (“Leviton’s”) patent prosecutors, Claude Narcisse (“Narcisse”). Narcisse, a veteran patent prosecutor, with twelve years of patent prosecution experience, drafted claims for a patent application, U.S. Patent Application No. 10/690,776 (“the Germain application”), and filed it with the U.S. Patent and Trademark Office (“PTO”) on behalf of Levitón. Within six months, he drafted almost indistinguishable claims for a different patent application, U.S. Patent Application No. 10/827,093 (“the '766 patent application”), also owned by Levitón. Specifically, two independent claims and six dependent claims in the '766 patent application were word-for-word identical to those in the Germain application, with the exception of one insignificant phrase. Although the '766 patent application claimed the same invention as the Germain application, Narcisse attributed the '766 patent application to a completely different set of inventors. He proceeded to file the '766 patent application with a priority date three-and-a-half years earlier than the Germain application, expedite the prosecution of the '766 patent application, and prosecute the '766 patent application, through issuance as U.S. Patent No. 6,864,766 (“the '766 patent”), without informing the PTO about the co-pending Germain application. Narcisse did not disclose the Germain application even though, as he admitted in his deposition testimony, he alone drafted both sets of claims, was aware of the near identicality of the claims in the two applications, and was familiar with double-patenting rejections, which inevitably arise when different inventive groups submit indistinguishable claims in commonly-owned patent applications. Narcisse’s best explanation for his failure to inform the PTO about the Germain application is that he did not think it was material because it was not prior art. This purported justification is not only entirely incorrect but, in my opinion and in that of the district court, incredulous given the many reasons the Germain application should have been disclosed, including its obvious importance to inventorship and double-patenting issues.
In addition to withholding the Germain application, Narcisse did not disclose that the parent patents of the '766 patent were the subject of twelve litigations before the '766 patent issued (“the related litigation”), eight of which had allegations of invalidity, unenforceability, or inequitable conduct pending and unresolved during the prosecution of the '766 patent. At his deposition, Narcisse admitted that he knew about the related litigation, that he was aware that some of the litigations involved allega *1367 tions of invalidity or unenforceability, and that he was actually involved in three of the litigations before the '766 patent issued. He even admitted that, at the time he prosecuted the '766 patent, he was familiar with the specific Manual of Patent Examining Procedure (“MPEP”) provision, MPEP § 2001.06(c), that mandates disclosure of litigation involving the subject matter of a patent application, as well as allegations of inequitable conduct arising in this litigation. Nevertheless, Narcisse provided absolutely no explanation for failing to disclose the related litigation. By admitting personal knowledge of the related litigation and familiarity with the MPEP provision requiring its disclosure, without providing any justification for withholding this information, Narcisse all but admitted that he withheld the related litigation with intent to deceive.
Under these facts, the district court, in my opinion, properly found inequitable conduct on summary judgment. The majority holds that both the Germain application and the related litigation were material to the prosecution of the '766 patent but concludes that the district court could not infer deceptive intent on summary judgment. Even under the de novo standard of review applicable to summary judgment,[1] I disagree with the majority’s refusal to uphold the district court’s inference of intent to deceive. I would affirm the *1368 district court’s finding of intent because an inference of deceptive intent is not merely the “single most reasonable inference,” Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed.Cir. 2008), but the only reasonable inference permitted under the circumstances presented in this case.
I part ways with the majority for a number of reasons. First, in holding the Germain application to be merely “material,” the majority appears to sidestep our precedent establishing that the Germain application was “highly material” to the prosecution of the '766 patent based on the possibility that its disclosure could result in a double-patenting rejection of the '766 patent. Second, with respect to deceptive intent, the majority seems to overlook Narcisse’s most critical admissions regarding his recognition of the materiality of the withheld information. Specifically, the majority is silent as to Narcisse’s awareness that the PTO could issue a double-patenting rejection in a situation like the one presented by the commonly-owned Germain application and '766 patent application, which claimed the identical invention to different inventive groups. The majority is also silent regarding Narcisse’s admission that he was familiar with MPEP § 2001.06(c), which unambiguously required him to disclose the related litigation, as well as the pending inequitable conduct allegations in this litigation, to the PTO.
The majority compounds these case-specific problems by suggesting legal standards for which I believe there is no basis in our precedent. In refusing to meaningfully assess the plausibility of Narcisse’s purported explanation for withholding the Germain application, the majority diverges from our case law establishing that implausible and specious justifications for withholding material information do not raise a genuine issue of material fact for summary judgment purposes. See Majority Op. at 1363-64. Further, the majority suggests that the belated disclosure, in reexamination proceedings, of information withheld during the prosecution of a patent may establish good faith sufficient to avoid a finding of deceptive intent. Id. at 1374. This representation contradicts our precedent, which properly recognizes that a delayed disclosure is irrelevant to the inequitable conduct inquiry, an inquiry that focuses exclusively on the patentee’s intent during the initial prosecution of the patent. Quite simply, the standards and reasoning put forward by the majority seem to create an insurmountable burden for an inference of deceptive intent.
I. Analysis
A party asserting inequitable conduct must prove that the patent applicant “(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].” Star Scientific, 537 F.3d at 1365. Both elements, materiality and intent to deceive, are questions of fact, and at least a threshold level of each must be proven by clear and convincing evidence. See id. If the party asserting inequitable conduct establishes threshold levels of materiality and intent, the court must then weigh the materiality and intent, in light of all of the circumstances, to determine whether the applicant’s conduct was egregious enough to warrant a finding of inequitable conduct. Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1313-14 (Fed.Cir. 2008); Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1186 (Fed.Cir.2006). In making this determination, “[t]he more *1369 material the omission or misrepresentation, the lower the level of intent ... required to establish inequitable conduct.” Star Scientific, 537 F.3d at 1367.
A. The Germain Application
1. Materiality
The majority “agree[s] with Meihao and the district court that ... the Germain application was material,” specifically to inventorship and double-patenting, in the prosecution of the '766 patent. Majority Op. at 1358-59, 1359-62. The district court, however, found that the Germain application was not merely “material” but was “highly material,” a significant distinction that the majority does not acknowledge.[2] Summary Judgment Order at 699— 700. The district court found the application “highly material,” because 37 C.F.R. § 10.23(c)(7) required its disclosure and it could have raised concerns regarding inventorship, double-patenting, and the written description requirement. Id. at 694-700. Based on the Germain application’s importance to inventorship and double-patenting issues, I would uphold the district court’s “high materiality” finding.
As the district court concluded, the Ger-main application was “highly material” because it “could have conceivably served as the basis of a double patenting rejection” of the '766 patent. Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1365 (Fed.Cir.2003); Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380, 1382 (Fed.Cir.1998). The majority properly recognizes that, under MPEP § 804, disclosure of the co-pending, commonly-owned Germain application, with nearly identical claims to the earlier-priority '766 patent application, would have led to “an immediate provisional [double-patenting] rejection” of each application. See MPEP § 804; Majority Op. at 1361 (emphasis added). Furthermore, the PTO examiner would not have been required to withdraw the rejection as to the earlier-priority '766 patent application, allowing the '766 patent to issue as opposed to the Germain application. See MPEP § 804; Majority Op. at 1361. Instead, “the PTO could have rejected the '766 patent for double-patenting.” Majority Op. at 1361; see Dayco Prods., 329 F.3d at 1365; Akron Polymer, 148 F.3d at 1382.
Under our precedent in Akron Polymer and Dayco Products, which the majority does not mention or distinguish, this potential for a double-patenting rejection is sufficient to make the Germain application “highly material.” In both cases, we concluded that a withheld later-priority application was “highly material” to an earlier-priority application claiming similar subject matter because “it could have conceivably served as the basis for a double patenting rejection.” Dayco Prods., 329 F.3d at 1365; Akron Polymer, 148 F.3d at 1382.
Further, under the “reasonable examiner” standard, our main standard for materiality, “information is material when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.” Star *1370 Scientific, 537 F.3d at 1367. Applying this standard, the Germain application’s importance to double-patenting would have made it critical to any examiner’s evaluation of the '766 patent. Accordingly, I would uphold the district court’s determination that, based on its importance to double-patenting concerns, the Germain application was “highly material.”
In addition, the Germain application was “highly material” to inventorship issues in the prosecution of the '766 patent. “As a critical requirement for obtaining a patent, inventorship is material.” Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321 (Fed.Cir.2000). Where information is relevant to inventor-ship, “whether the inventorship of the patents as issued is correct does not determine the materiality of the [information].” Id. at 1322. As such, regardless of whether the inventorship of the '766 patent is correct, the withheld Germain application was “highly material.” A “reasonable examiner” evaluating the '766 patent application would have found the co-pending Germain application, which had several nearly identical claims attributed to an entirely different set of inventors, critical in evaluating patentability. The Germain application would have raised serious concerns regarding whether the asserted inventors actually conceived of the invention claimed in the '766 patent. Without the Germain application, however, the examiner had no reason to question the asserted inventorship. Although the majority properly recognizes that disclosure of the Ger-main application would have raised “serious questions regarding inventorship” and “a substantial inventorship question that would have required additional investigation by the examiner,” the majority nonetheless holds that the Germain application was only “material.” Majority Op. at 1360. In my opinion, given how critical the Germain application would have been to triggering these significant inventorship concerns, it was “highly material” to inventorship.
Thus, in light of the importance of the Germain application to inventorship and double-patenting issues in the prosecution of the '766 patent, I would affirm the district court’s finding that the Germain application was “highly material.”
2. Intent
Because “direct evidence of deceptive intent is rarely available,” Star Scientific, 537 F.3d at 1366, intent to deceive must generally be inferred from circumstantial evidence, M. Eagles, 439 F.3d at 1341. In other words, “ ‘smoking gun’ evidence is not required ... to establish an intent to deceive.” Paragon Podiatry, 984 F.2d at 1189. Nevertheless, the evidence establishing intent “must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement.” Star Scientific, 537 F.3d at 1366. Even gross negligence is not sufficient. Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed.Cir.1988).
Rather, to justify an inference of deceptive intent, “the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.” Astrazeneca Pharms. LP v. Teva Pharms. USA, Inc., 583 F.3d 766, 776 (Fed.Cir.2009). The inference of deceptive intent “must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evi *1371 dence to meet the clear and convincing standard.” Larson Mfg. Co. of S. Dakota, Inc. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1340 (Fed.Cir.2009); Star Scientific, 537 F.3d at 1366.
Because an inference of deceptive intent is the only reasonable inference to be drawn from the facts surrounding Narcisse’s withholding of the Germain application, I disagree with the majority’s refusal to uphold the district court’s finding of intent. At the time he prosecuted the '766 patent, Narcisse was a seasoned patent attorney, having practiced as a patent prosecutor for approximately twelve years. See J.A.1972-76; see also Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed.Cir. 1995) (upholding finding of inequitable conduct where the district court considered the experience of the patent prosecutor). Not surprisingly, Narcisse admitted in his deposition testimony that when he prosecuted the '766 patent, he was aware of his duty of disclosure and his understanding that “in cases which are not entirely clear, it is better to disclose the information to the [PTO] and let the [PTO] decide what is material.” J.A.2014. More specific to the Germain application, Narcisse acknowledged that he was familiar with the possibility of double-patenting rejections in situations, like the one presented in this case, where commonly-owned applications with different inventive groups claim the same invention. J.A.1991 (“Q.... [I] f two different inventive groups tried to submit the same claim in two different applications, but both were owned by Levitón, that could give rise to a double patenting rejection; is that right? ... A. Yes. Q. And you were aware of that when the '766 patent was prosecuted? A. Yes.”).
Narcisse alone drafted the claims in both the Germain application and the '766 patent application in the course of just six months. J.A.1983-84, 2001. Therefore, he admittedly knew not only that both co-pending applications existed but also that they had what he described as “very similar” claims. J.A.1998, 2021. Despite his intimate knowledge of the Germain application and his familiarity with double-patenting rejections, Narcisse did not disclose the Germain application to the PTO. J.A. 1998.
The district court properly noted that Levitón had a motive to conceal the Ger-main application, with a priority date three-and-a-half years later than the '766 patent, during the prosecution of the '766 patent. See Summary Judgment Order at 710. The PTO’s awareness of the Germain application, at a minimum, would have delayed the expedited prosecution of the '766 patent application arising out of the Petition to Make Special. At worst, the Ger-main application could have prevented the '766 patent from issuing. Further, with such an earlier priority date, the '766 patent avoided a significant amount of prior art, including the allegedly infringing product in this case, which was manufactured after the priority date of the '766 patent but before the priority date of the Germain application. See id.
It seems to me that the circumstances surrounding Leviton’s withholding of the Germain application are as egregious as possible short of an explicit admission of intent to deceive the PTO. An experienced patent prosecutor drafted the claims for two co-pending applications, listing entirely different inventors, within months of one another and thus was intimately familiar with their nearly indistinguishable claims. He was also admittedly aware of his duty of disclosure and the potential for a double-patenting rejection in this sitúa *1372 tion, yet did not disclose the Germain application. In my view, these facts undoubtedly “indicate sufficient culpability to require a finding of intent to deceive.” Kingsdoim, 863 F.2d at 876. As such, I believe Meihao met its burden to prove a threshold level of intent to deceive by clear and convincing evidence.
Given that Meihao met its threshold burden to prove intent, the district court correctly considered Leviton’s purported good faith explanation for withholding the Germain application. “The patentee need not offer any good faith explanation unless the [party asserting inequitable conduct] first carries [its] burden to prove a threshold level of intent to deceive by clear and convincing evidence.” Star Scientific, 537 F.3d at 1368. Once the party asserting inequitable conduct meets its threshold burden, however, it is “incumbent upon the patentee to rebut the evidence of deceptive intent with a good faith explanation for the alleged misconduct.” Id.
Throughout Narcisse’s deposition, he refused to answer many questions about the prosecution of the '766 patent and his withholding of the Germain application. Nevertheless, Narcisse did put forward two explanations for his failure to disclose the Germain application. First, Narcisse asserted that he did not disclose the Ger-main application because it was not prior art. Second, Narcisse claimed that he did not believe that 37 C.F.R. § 1.604(b) required disclosure of the Germain application.
In considering a patentee’s good faith explanation for withholding information from the PTO, “merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses” do not raise a genuine issue of material fact for summary judgment purposes. Digital Control, 437 F.3d at 1314 (emphasis added); Paragon Podiatry, 984 F.2d at 1190 (emphasis added); see Ferring, 437 F.3d at 1193. In other words, to create a genuine issue of material fact, the patentee must put forward a “plausible justification or excuse.” Digital Control, 437 F.3d at 1314 (emphasis added); Paragon Podiatry, 984 F.2d at 1191 (emphasis added). Leviton’s contention at oral argument that “for summary judgment purposes, [the district court] need [ed] to take [Narcisse] at his word [;] ... whether it’s a credible explanation or not, it’s his explanation,” Oral Arg. at 19:45-20:01 available at http:// oralarguments. cafe, uscourts. gov/mp3/ 2009-H.21.mp3, squarely contradicts this precedent and is therefore wrong as a matter of law. In my opinion, the district court properly rejected Narcisse’s justifications as “implausible” and therefore insufficient to raise a genuine issue of material fact. See Summary Judgment Order at 710.
First, Narcisse claimed that he did not disclose the Germain application as a result of his belief that the Germain application was not material because it “[wa]s not a prior art reference to the '766 [patent] application.” J.A.1998-99, 2001, 2021-22; see Oral Arg. at 7:24-29, 19:15-22, 22:25-33 (“[Narcisse’s] testimony is that he did not believe [the Germain application] was material because ... it was not prior art....”), 60:24-59.
Our precedent makes clear that “[m]ateriality is not limited to prior art but [instead] embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent.” Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1226 (Fed. Cir.2006) (emphasis added); Bristol- *1373 Myers Squibb Co. v. Rhone-Poulenc Rover, Inc., 326 F.3d 1226, 1234 (Fed.Cir. 2003); GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed.Cir.2001); see Critikon, 120 F.3d at 1258. Thus, it is indisputable that Narcisse’s supposed reasoning is entirely incorrect.
More importantly, the district court correctly rejected Narcisse’s explanation as implausible. It is implausible that Narcisse, a veteran patent prosecutor and a member of the patent bar for more than a decade, believed that the only material information that must be brought to the PTO’s attention is prior art. This purported justification ignores the broad spectrum of information, with which Narcisse was admittedly familiar, that the MPEP and the Code of Federal Regulations require to be disclosed. The most basic patent law treatises, in addition to our case law, explain that materiality is not limited to prior art. See, e.g., 4A-15 Donald S. Chisum, Chisum on Patents § 15.04 (2010) (“A patent applicant’s duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO.”); Robert A. Matthews, Jr., Annotated Patent Digest § 27:47 (2010) (“Just because information may not qualify as prior art does not necessarily mean it is not ‘material.’ ”); see also 3-7 Donald S. Chisum, Chisum on Patents § 7.05; 4-11 id. § 11.03.
The patent bar, an examination Narcisse passed approximately ten years before prosecuting the '766 patent, requires familiarity with the MPEP, which obligates patent applicants to disclose to the PTO information other than prior art. J.A.1976 (“I became very familiar with the MPEP, 37 CFR, and old or previous patent bar exams.”). In fact, Narcisse admitted his awareness of MPEP provisions that require the disclosure of information that is obviously not prior art, such as MPEP § 2001.06(c), which provides:
Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the [PTO]. Examples of such material information, include evidence of possible prior public use or sales, questions of inventor-ship, prior art, allegations of ‘fraud,’ ‘inequitable conduct,’ and ‘violation of duty of disclosure.’ Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner.
MPEP § 2001.06(c) (emphases added); J.A.2008 (“Q. Could you look at 2001.06(c).... Were you aware of that rule or provision at the time you prosecuted the '766 [Pjatent [Application? A. Yes I was.”). Not only does this provision require disclosure of “the existence of ... litigation” involving the subject matter of a patent application, information that clearly falls outside the realm of prior art, but also the listed examples of material information show that materiality is not limited to pri- or art. Rather, prior art is but one example in the list of “examples of such material information.” See MPEP § 2001.06(c). Narcisse’s rationale for failing to disclose the Germain application is thus inconsistent with MPEP provisions that he admits he was familiar with at the time he prosecuted the '766 patent. This specific inconsistency, together with the fact that it is inconceivable that a patent prosecutor with more than a decade of experience would equate materiality solely with prior art, leads me to firmly agree with the district *1374 court’s conclusion that Narcisse’s purported justification is entirely implausible and insufficient to create a genuine issue of material fact. In my view, in light of our case law holding that specious and implausible explanations for withholding material information do not raise a genuine issue of material fact, there is no basis in our precedent for the majority’s refusal to allow the district court to reject Narcisse’s explanation as “unreasonable” and “implausible” and therefore insufficient to create a genuine issue of material fact on summary judgment. See Majority Op. at 1363-64.
Narcisse’s second explanation for his failure to disclose the Germain application is based on a technical reading of the language “of another” in 37 C.F.R. § 1.604(b). 37 C.F.R. § 1.604(b) provides that “[wjhen an applicant presents a claim known to the applicant to define the same patentable invention claimed in a pending application of another, the applicant shall identify that pending application____” 37 C.F.R. § 1.604(b) (emphasis added). In his deposition testimony, Narcisse admitted that he was familiar with the provision at the time he prosecuted the '766 patent but claimed that he “didn’t think,” “d[id]n’t know,” and was “not sure” whether the provision would have applied to applications “owned by the same entity.” J.A. 2013-14. Yet he never discussed his understanding of the provision with anyone. J.A.2014. Even if, as the majority holds, Narcisse was correct that 37 C.F.R. § 1.604(b) did not mandate disclosure of the Germain application, this is a technical argument about a specific disclosure provision. See Majority Op. at 1359-60. This purported explanation does not affect the other obvious reasons why the Germain application should have been disclosed to the PTO during the prosecution of the '766 patent.
As previously discussed, the Germain application would have been critical to the prosecution of the '766 patent, raising substantial inventorship and double-patenting issues. Any patent practitioner, never mind one with Narcisse’s level of experience, would realize that the co-pending Germain application and the '766 patent application, claiming the same invention but attributing it to different people, could not both issue as patents. It is obvious that the PTO would want to be made aware of the co-pending applications to investigate inventorship issues and avoid double-patenting. Narcisse did not provide any rationale for believing these concerns to be inapplicable to his prosecution of the '766 patent. Instead, he admitted that he was aware that the situation that the commonly-owned Germain application and '766 patent application presented “could give rise to a double [-] patenting rejection.” J.A.1991.
Leviton’s proposed inference that Narcisse did not disclose the Germain application because he did not believe it was material prior art and did not think 37 C.F.R. § 1.604(b) required its disclosure is simply unreasonable. Instead, given the obvious reasons the application would have been highly important to the prosecution of the '766 patent, as well as Narcisse’s awareness of the substantially similar claims and that such a situation could lead to a double-patenting rejection, the overwhelming circumstantial evidence suggests that Narcisse purposefully withheld the Germain application. In light of these glaring facts, an inference of deceptive intent is the only reasonable inference to be drawn from Narcisse’s withholding of the Germain application. See Star Scientific, 537 F.3d at 1366. I would therefore uphold the district court’s inference of deceptive intent on summary judgment.[3]
*1375 B. Related Litigation
It is undisputed that the parent patents of the '766 patent were involved in twelve litigations before the '766 patent issued and that Levitón did not disclose any of these litigations to the PTO during the prosecution of the '766 patent. A review of the district court docket for each litigation shows that of these twelve litigations, six were filed, and four had been pending for almost a year, before Levitón filed the '766 patent application. Eight of these litigations had allegations of invalidity, unenforceability, or inequitable conduct pending before Levitón applied for the '766 patent, four of which involved such allegations for more than eight months before prosecution began.
1. Materiality
Like the majority, I would uphold the district court’s finding that the withheld related litigation was material. See Majority Op. at 1362-63; Summary Judgment Order at 701. As the majority recognized, MPEP § 2001.06(c) explicitly requires the disclosure of the “existence of ... litigation” involving “the subject matter for which a patent is being sought,” as well as “any other material information arising” from the litigation, including “allegations of ‘fraud,’ ‘inequitable conduct,’ and ‘violation of duty of disclosure.’ ” MPEP § 2001.06(c). We have held that “[i]t is elear from the language of § 2001.06(c) that the existence of the litigation itself is material information that an examiner needs to have. It is important because it signals the examiner that other material information relevant to patentability may become available through the litigation proceedings.” Nilssenv. Osram Sylvania, Inc., 504 F.3d 1223, 1234 (Fed.Cir.2007). Thus, the existence of the related litigation, as well as the pending allegations of inequitable conduct and unenforceability, was material information that Levitón had a duty to disclose. That Levitón ultimately avoided a finding of invalidity or unenforceability in these litigations is irrelevant to whether a reasonable examiner, at the time the '766 patent was being prosecuted, would have found the pending litigations and their inequitable conduct allegations important in assessing patentability.
2. Intent
As with the Germain application, I disagree with the majority’s conclusion that the district court could not infer, on summary judgment, that Narcisse withheld information about the related litigation with deceptive intent. See Majority Op. at 1363-64. In light of Narcisse’s critical admissions during his deposition, there is simply no other inference to be drawn from the evidence.
*1376 First, Narcisse admitted that he was aware of the pending related litigation and that he knew some of these litigations raised allegations of invalidity and unenforceability. J.A.2008-10. He further acknowledged that he was actively involved in three of these litigations before the '766 patent issued. J.A.2008-10, 2020-21. As such, there is no question that Narcisse knew of the related litigation.
Narcisse also admitted that he was familiar with the MPEP provision that mandates disclosure of the related litigation. Specifically, Narcisse acknowledged his awareness of MPEP § 2001.06(c), which requires disclosure of the “existence of ... litigation” involving the subject matter of a patent application and any allegations of inequitable conduct in these litigations. MPEP § 2001.06(c); J.A.2008 (“Q. Could you look at 2001.06(c).... Were you aware of that rule or provision at the time you prosecuted the '766 [P] atent [A] pplication? A. Yes I was. Q. And you were aware that this was part of your duty of disclosure? A. Yes.”). Narcisse also admitted that he understood that this provision was part of his “duty of disclosure.” J.A.2008. Notably, the majority opinion nowhere references this significant admission.[4]
Narcisse further admitted that he did not disclose the existence of the related litigation. J.A.2010. Narcisse’s admissions as to his knowledge of the related litigation and of his duty, yet failure, to disclose the information are more than sufficient for Meihao to meet its threshold burden to show deceptive intent.
Levitón has never attempted to rebut this showing by providing a justification for Narcisse’s failure to disclose the related litigation during the prosecution of the '766 patent. The majority recognizes Narcisse’s “fail[ure] to provide any explanation at his deposition for why he did not disclose [the] related litigation” but goes on to cite Larson Manufacturing for the proposition that “the failure to provide an explanation is not independently dispositive of whether a patent prosecutor intended to deceive the PTO.” Majority Op. at 1364. Larson Manufacturing, however, states only the familiar rule that “an accused infringer cannot carry its threshold burden simply by pointing to the absence of a credible good faith explanation.” 559 F.3d at 1341. In other words, “the patentee is not required to offer evidence of good faith unless the accused infringer first meets its burden to prove — by clear and convincing evidence — the threshold level of deceptive intent.” Id. Meihao does not rely on Narcisse’s failure to provide a good faith explanation in order to meet its threshold burden to establish deceptive intent. Narcisse’s many critical admissions regarding his withholding of the related litigation, despite knowing of the information and his duty to disclose it, are more than sufficient to pass this threshold. Once Meihao satisfied this burden, it became “incumbent upon [Levitón] to rebut the evidence of deceptive intent with a good faith explanation for the alleged misconduct.” Star Scientific, 537 F.3d at 1368. Yet Narcisse has put forward no such explanation. The fact that Narcisse has pro *1377 vided no excuse for his actions is not, as the majority implies, Meihao’s only evidence of intent. Rather, Narcisse’s failure to provide a good faith explanation serves only to prevent Levitón from rebutting Meihao’s strong showing of intent to deceive.
The majority proceeds to reason that Narcisse’s belated disclosure of the related litigation in reexamination proceedings, more than two years after the '766 patent had issued and Meihao had raised the inequitable conduct allegations in this case, “may be evidence of good faith.” Majority Op. at 1364. This proposition, for which the majority provides no citation, conflicts with our precedent. We have held that a patentee’s disclosure of withheld information in re-examination and re-issuance proceedings is “irrelevant” to whether the patentee committed inequitable conduct in acquiring the patent, an inquiry that centers on the patentee’s “intent during the prosecution of the original application.” Bristol-Myers Squibb Co., 326 F.3d at 1241; see Molins PLC, 48 F.3d at 1182 (“We recognize that [the withheld references] were cited eventually to the PTO and that the examiner ... passed the reexamination application to issue thereafter. However, the references were not cited when they should have been.”). Thus, the majority’s suggestion that Levitón may be able to establish good faith in the prosecution of the '766 patent by its disclosure of the related litigation years after the patent issued, where Narcisse knew of the related litigation and his duty to disclose it at the time of the initial prosecution, is, in my view, contrary to our precedent.
In sum, Narcisse all but admitted that he withheld the related litigation with deceptive intent. If we do not accept that an inference of deceptive intent is the “single most reasonable inference,” Star Scientific, 537 F.3d at 1366, where a patent prosecutor provides absolutely no explanation, good faith or otherwise, for his conduct and admits (1) that he knew of and had personal involvement with the withheld material information; (2) that he was familiar with specific MPEP provision that, by its express, unambiguous terms, mandates disclosure of the information; (3) that he understood this provision to be part of his duty of disclosure to the PTO; and (4) that he still did not disclose the information, then I fail to see when an inference of intent on summary judgment will ever be permissible. The only reasonable inference to be drawn from Narcisse’s unexplained failure to disclose the related litigation, despite his admitted knowledge of the pending related litigation and the MPEP provision that requires its disclosure, is that he deliberately withheld information about the litigations from the PTO. Therefore, I would uphold the district court’s inference of deceptive intent.
C. Lack of an Evidentiary Hearing
Levitón argues that the district court should have held an evidentiary hearing where Narcisse could fully explain his conduct and the court could assess his credibility. Accepting the majority’s premise that this was a summary judgment motion, see supra n. 1, Levitón had “ample opportunity” to create a genuine issue of material fact to avoid summary judgment. Paragon Podiatry, 984 F.2d at 1192. Yet Leviton failed to do so.
Throughout Narcisse’s deposition, he was repeatedly asked about his rationale for withholding both the Germain application and the related litigation but refused to answer numerous questions on these topics. Nevertheless, when Meihao filed a *1378 motion for summary judgment, Levitón chose not to submit an affidavit from Narcisse to further explain his decisions to withhold this information. At the oral hearing on Meihao’s summary judgment motion, the district court accepted new evidence from Levitón, but Levitón still did not attempt to supplement the record with oral testimony or affidavits from Narcisse or any other witness.
“On summary judgment, in order to create a genuine issue, [Levitón] bore the burden of submitting an affidavit from [Narcisse] to contradict [Meihao’s] evidence of intent if [it] believed that testimony from [Narcisse] would establish credible evidence for the withholding.” Ferring, 437 F.3d at 1192. At oral argument, Levitón represented that it did not submit any additional evidence, because it thought it would win on summary judgment. Oral Arg. at 4:14-5:26. This, however, was a strategic decision for which Levitón must suffer the consequences. Moreover, Levitón has not indicated or even suggested that there is additional evidence or explanation that might change the result. See Paragon Podiatry, 984 F.2d at 1192. It merely argues that, on the record before the court, it should have survived summary judgment. Because Levitón failed to put forward evidence raising a genuine issue of material fact, Ferring, 437 F.3d at 1193, Levitón was not entitled to avoid summary judgment and thus have an evidentiary hearing. Accordingly, the district court properly granted summary judgment of inequitable conduct against Levitón.
II. Conclusion
As the district court recognized, Levi-ton’s arguments “comprise in the main a jumble of miscitations to legal standards; blatant ignoring of other, controlling standards; reliance on arguments that are ... utterly irrelevant to the issues presented; and a veritable sea of red herrings.” Summary Judgment Order at 679. By accepting many of these arguments, the majority opinion arguably creates troubling new standards for intent to deceive. The majority overlooks the disturbing facts of this case in which an experienced patent prosecutor withheld critical information with which he was intimately familiar, despite his awareness of reasons that the PTO would want to be made aware of the information and lack of a credible reason for the omissions. In overturning the district court’s finding of deceptive intent on these facts, the majority’s legal standards and reasoning take the burden to establish deceptive intent to an unprecedented level. I cannot agree with the majority’s analysis and would affirm the district court’s inequitable conduct determination, including its finding of deceptive intent.

. I would review the district court’s grounds for its "exceptional” case finding, both inequitable conduct and vexatious litigation, under the standard of review applicable to an “exceptional case” finding under 35 U.S.C. § 285, rather than the de novo standard applicable to summary judgment. Determining whether a case is "exceptional” is the first step in deciding whether to award attorney fees under 35 U.S.C. § 285. See Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1327-29 (Fed.Cir.2003). We review the "[district] court’s factual findings, including whether the case is exceptional, for clear error” but we "review de novo whether the court applied the proper legal standard under [35 U.S.C.] § 285.” Id. at 1328; Waner v. Ford Motor Co., 331 F.3d 851, 857 (Fed.Cir.2003); see Reactive Metals & Alloys Corp. v. ESM, Inc., 769 F.2d 1578, 1583 (Fed.Cir.1985). As such, where an inequitable conduct determination was made solely as a predicate for finding the case "exceptional” under 35 U.S.C. § 285, we have reviewed the factual findings, including materiality and intent, for "clear error.” Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1352, 1354-55 (Fed.Cir.2005); see Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1366-67 (Fed.Cir.2004).
Here, the district court determined inequitable conduct, as well as vexatious litigation, as grounds for finding the case “exceptional” in the context of Shanghai Meihao Electric, Inc.’s ("Meihao’s”) motion for attorney fees. Leviton Mfg. Co. v. Shanghai Meihao Elec., Inc., 613 F.Supp.2d 670, 678 (D.Md.2009) (order granting summary judgment) (‘‘Summary Judgment Order”). Yet the majority characterizes the district court’s inequitable conduct determination as a summary judgment and reviews this determination de novo. Majority Op. at 1358, 1364. The majority proceeds to review the vexatious litigation finding, the other grounds for the "exceptional case” finding, for "clear error.” Id. at 1375. In so doing, the majority opinion is internally inconsistent and, as to the standard of review applicable to the inequitable conduct determination, incorrect. Given that Meihao filed this motion after the entire consolidated case had been dismissed, there were no claims or counterclaims pending at the time of the inequitable conduct determination. Thus, the inequitable conduct determination was clearly not a summary judgment decision and should not be reviewed as such.
Nevertheless, my disagreement with the majority in no way rests on the standard of review. Even under the more rigorous de novo standard of review, I would affirm the district court’s determination of inequitable conduct in light of the particularly egregious facts of this case. As such, I have treated the case under the majority’s premise that the district court made its inequitable conduct determination on summary judgment.

. The degree of materiality plays a critical role in the intent analysis. The more material the withheld reference, the more likely that an inference of deceptive intent is "the single most reasonable inference able to be drawn from the evidence." See Star Scientific, 537 F.3d at 1365; see also Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1366-67 (Fed.Cir. 2007) (quoting Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1257 (Fed.Cir. 1997)); Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1134-35 (Fed.Cir.2006).

. I am not sure what to make of the majority's statement that "[w]e rarely affirm a grant of summary judgment of inequitable conduct, and in those cases where we have affirmed, the applicants did something other than fail to disclose a commonly owned application or related litigation.” Majority Op. at 1363; see id. at 1373-74. The majority appears to be resting, at least in part, on the idea that we have never faced facts analogous to those presented in this case. I agree with the majority that the striking facts of this case are unusual, yet I cannot agree that this is a reason not to affirm the district court’s finding of inequitable conduct. We regularly decide cases involving novel facts by applying our legal standards to the new factual situation presented. In my view, the novelty of the factual situation currently before the court suggests only that the exceptional and egregious conduct in this case is not common amongst practitioners before the PTO.

. This is perhaps a result of the parties' errors at oral argument. In arguing that Narcisse admitted his awareness of his duty to disclose the related litigation, Meihao’s counsel cited the wrong page of Narcisse’s deposition testimony. Meihao’s counsel cited to J.A.1975, but the proper citation is J.A.2008. See Oral Arg. at 43:52-45:55; J.A.2008. As such, Levi-ton's counsel was also incorrect in asserting his belief that there was not "any testimony that [Narcisse was] aware of this particular provision,” namely MPEP § 2001.06(c). Oral Arg. at 59:01-11.